UNITED STATES *v.* HARRIS & CO. *et als.* (No. 987).[1]

CLAIMS FOR ALLOWANCE.

> The importation of grapes for the Boston market were entered partly at Boston, partly at New York for transshipment thence to Boston. Were the grapes immediately transshipped from New York "landed" there or in Boston? The fair inference from the acts and regulations that govern is that the "landing" referred to in subsection 22 of section 28, tariff act of 1909, is the landing at the port of actual destination; in this case, at the port of Boston.

United States Court of Customs Appeals, April 29, 1913.

APPEAL from Board of United States General Appraisers, Abstract 28947 (T. D. 32655).

[Affirmed.]

*William L. Wemple*, Assistant Attorney General (*Charles E. McNabb*, assistant attorney, of counsel), for the United States.

*Searle & Waterhouse* (*William E. Waterhouse* of counsel) for appellees.

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

DE VRIES, Judge, delivered the opinion of the court:

The importations were of grapes at the port of Boston. Some of the importations were made direct from abroad, whilst others were

[1] Reported in T. D. 33392 (24 Treas. Dec., 645).

made via New York, arriving at the port of Boston via Metropolitan Steamship Co. The protestants, who are appellees here, rest their claim upon the contention that a part of the grapes in every case were rotten or worthless and that allowance should be made in the assessment of duties for their depreciation in value and such loss and decay. The claim is asserted under subsection 22 of section 28 of the tariff act of 1909, which reads as follows:

22. No allowance shall be made in the estimation and liquidation of duties for shortage or nonimportation caused by decay, destruction or injury to fruit or other perishable articles imported into the United States whereby their commercial value has been destroyed, unless under regulations prescribed by the Secretary of the Treasury. Proof to ascertain such destruction or nonimportation shall be lodged with the collector of customs of the port where such merchandise has been landed, or the person acting as such, within ten days after the landing of such merchandise. The provisions hereof shall apply whether or not the merchandise has been entered, and whether or not the duties have been paid or secured to be paid, and whether or not a permit of delivery has been granted to the owner or consignee. Nor shall any allowance be made for damage, but the importers may within ten days after entry abandon to the United States all or any portion of goods, wares or merchandise of every description included in any invoice and be relieved from the payment of duties on the portion so abandoned: *Provided,* That the portion so abandoned shall amount to ten per centum or more of the total value or quantity of the invoice. The right of abandonment herein provided for may be exercised whether the goods, wares or merchandise have been damaged or not, or whether or not the same have any commercial value: *Provided, further,* That section twenty-eight hundred and ninety-nine of the Revised Statutes, relating to the return of packages unopened for appraisement, shall in no wise prohibit the right of importers to make all needful examinations to determine whether the right to abandon accrues, or whether by reason of total destruction there is a nonimportation in whole or in part. All merchandise abandoned to the Government by the importers shall be delivered by the importers thereof at such place within the port of arrival as the chief officer of the customs may direct, and on the failure of the importers to comply with the direction of the collector or the chief officer of customs, as the case may be, the abandoned merchandise shall be disposed of by the customs authorities under such regulations as the Secretary of the Treasury may prescribe, at the expense of such importers. Where imported fruit or' perishable goods have been condemned at the port of original entry within ten days after landing, by health officers or other legally constituted authorities, the importers or their agents shall, within twenty-four hours after such condemnation, lodge with the collector, or the person acting as collector, of said port, notice thereof in writing, together with an invoice description and the quantity of the articles condemned, their location, and the name of the vessel in which imported. Upon receipt of said notice the collector, or person acting as collector, shall at once cause an investigation and a report to be made in writing by at least two customs officers touching the identity and quantity of fruit or perishable goods condemned, and unless proof to ascertain the shortage or nonimportation of fruit or perishable goods shall have been lodged as herein required, or if the importer or his agent fails to notify the collector of such condemnation proceedings as herein provided, proof of such shortage or nonimportation shall not be deemed established and no allowance shall be made in the liquidation of duties chargeable thereon.

There seems to be no serious contention as to the claim of the importers with reference to the direct importations. As to those importations, however, made via New York, serious controversy

arises. It seems that at the port of New York the goods were transshipped from the importing vessels arriving at that port and continued in their course via the Metropolitan Steamship Co. to the port of Boston, their ultimate destination. At the port of New York they were entered for immediate transportation.

Under said subsection 22 the Secretary of the Treasury in T. D. 30023 promulgated regulations. These regulations were in part the subject of consideration by this court in Vandegrift v. United States (3 Ct. Cust. Appls., 198; T. D. 32470). They provide in that part (section 1 thereof) that whenever the importer intends to make claim of allowance "on account of shortage or nonimportation caused by decay, destruction, or injury to imported fruit," he shall within 48 hours after the arrival of the importing vessel give a prescribed notice that he so intends. That part of the regulations further provides for a detail of examiners for that purpose, who shall cause to be set aside 5 per cent of each lot, reporting thereupon to the appraiser, who shall within 10 days "after the landing of the merchandise" make return, etc.

There seems to be no question as to the compliance by the importer with these regulations so far as the detail of procedure is concerned, and the sole question in the case is whether or not this provision of the statute relates to the "landing" of the goods at the port of Boston or to the "landing" of the goods at the port of New York, whereupon they were transshipped to the port of Boston. If the former, the proofs were filed in time; if the latter, otherwise.

The claim is asserted under the first provision of subsection 22. That subsection authorized allowances in such case and prescribes that—

Proof to ascertain such destruction or nonimportation shall be lodged with the collector of customs of the port where such merchandise has been *landed*, or the person acting as such, within 10 days after the *landing* of such merchandise.

These goods were landed in the course of their importation to the port of Boston at both New York and Boston. The issue is which "landing" is contemplated by the statute. In the ascertainment of this question the statute must be read in connection with the act of June 10, 1880, in relation to immediate transportation of dutiable goods and for other purposes. United States Statutes at Large (vol. 21, chap. 190, p. 173). That statute authorizes in section 1 collectors at certain ports, of which New York is one, where the merchandise "shall appear by the invoice or bill of lading and manifest of the importing vessel to be consigned to and destined for either of the ports specified in the seventh section of this act" [of which Boston is one], "the collector at the port of arrival shall allow the said merchandise *to be shipped immediately after the entry* prescribed in section 2 of this act has been made."

Section 2 reads as follows:

2. That the collector at the port of first arrival shall retain in his office a permanent record of such merchandise so to be forwarded to the port of destination, and such record shall consist of a copy of the invoice and an entry *whereon the duties shall be estimated as closely as possible* on the merchandise so shipped, but no oaths shall be required on the said entry. Such merchandise *shall not be subject to appraisement and liquidation of duties at the port of first arrival,* but shall undergo such examination as the Secretary of the Treasury shall deem necessary *to verify the invoice;* and the same *examination and appraisement thereof shall be required and had at the port of destination* as would have been required at the port of first arrival if such merchandise had been entered for consumption or warehouse at such port.

Then follows section 3 for the designation by the Secretary of the Treasury of certain transportation companies as bonded carriers; section 5, that the merchandise shall, under this paragraph, be kept under lock and key and under the constant supervision of Treasury agents at the expense of the bonded transportation companies; that it shall not be unladen en route except in certain emergency cases; and *in no case shall there be permitted any breaking of the original packages* of such merchandise.

Section 6 provides as follows:

6. That merchandise so destined for immediate transportation shall be transferred, *under proper supervision, directly from the importing vessel to the car, vessel, or vehicle in which the same is to be transported* to its final destination.

Section 9 is as follows:

9. That no merchandise shall be shipped under the provisions of this act after such merchandise shall have been landed 10 days from the importing vessel, and merchandise not entered within such time shall be sent to a bonded warehouse by the collector as unclaimed, and held until regularly entered and appraised.

It will be observed from the provisions of this act that the Congress has exercised diligent care that merchandise taken from importing vessels and transshipped by immediate-transportation entries to other common carriers, be they vessels or otherwise, shall be constantly in the customs custody and under active supervision of the customs officials. It is further expressly provided that utmost expedition be had in such cases. The statute provides that the "merchandise *must be shipped immediately* after the entry prescribed in section 2 of this act has been made," which is the immediate-transportation entry; and, "under proper supervision," shall be transferred "directly from the importing vessel to the car, vessel," etc., "in which the same is to be transported."

It will be observed by a careful reading of the act of June 10, 1880, that no appraisement of the merchandise is provided at the port of arrival, such as would require an opening and inspection of the goods themselves, but the contrary is the mandate of the statute. It will be further observed that the detailed language of that section indicates that the only examination made at the port of arrival is to check up the *number of packages* and to note any shortage in that

particular. Indeed, while the express provision of the statute that "in no case shall there be permitted *any breaking of the original packages*" strictly applies alone to one of the bonded carriers, the spirit of the act, as expressed in its words, applies clearly to all officials and other carriers.

We are unable to see, therefore, how the provisions of subsection 22 and the regulations made thereunder (arts. 407 to 414, Customs Regulations, 1908) can be advantageously exercised, if at all, by an importer while the Government officials and bonded carriers are performing their duty according to the act of June 10, 1880. For while that act enjoins zealous care and strict noninterference and expeditious delivery of the merchandise in transit, the other act and regulations thereunder, in any practicable observance, require an opening of the packages, inspection of the merchandise, a delay in its transit, and an interference by the importer or his agents with the expeditious transportation of the merchandise.

That the Congress did not contemplate further examination of the merchandise at the port of arrival than to compare the number of packages and cases arriving with those on the invoice is emphasized by a corresponding provision in subsection 22, wherein the right to examine those in the custody of the customs by virtue of section 2899, Revised Statutes, is expressly granted the importer. This provision is significant that Congress deemed it had nowhere in this subsection granted the right of examination of the goods to the importer while in the customs custody, and as only those packages mentioned in said section 2899 were so held, after arrival at the port of final destination and granting of a permit of delivery, Congress must have deemed such express grant of the right of examination necessary whenever it was to be exercised.

Indeed, it may well be said that if the act of 1880 is at all observed the goods would have already, in the ordinary course of transportation, been transshipped from the port of arrival before the 48 hours would have expired within which the importer under the regulations should serve his notice upon the collector. It follows that if the importer had the right at the port of arrival within 48 hours to serve notice upon the collector, as within the regulations provided, and the goods had entered upon their course of transit, that notice would be futile, and the duty would be incumbent upon the collector at the port of New York to recall if possible the shipment in order that he should duly exercise his duties as otherwise prescribed by the law and regulations. Or, forsooth, should any passage have been reserved for the goods at a particular time by the shipper, examination by customs officials might seriously interfere with such.

And, if the point be rested upon the language of the act instead of the regulations, the same consequence might follow the contended

interpretation, for it is provided that proof *shall* be lodged with the collector at the port where the goods were "landed" "within 10 days *after the landing.*" Why file the proof or serve the notice aforesaid with the collector, who is not to determine the case? And, if the collector in the first instance is to determine the shortage, why so require, when the best evidence, the fruit, may have gone beyond his possession; or, if in his possession, when he is authorized by law to make only such examination as will verify the invoice? For examination for appraisement is to be made, under said act of 1880, only at the port of final destination. *A fortiori*, the statute expressly provides that the notice and proof can be made after "entry" after "duties have been paid or secured to be paid" and after "a permit of delivery has been granted." Under the law no one of these matters occurs at the port of arrival, and in consequence we infer Congress in the enactment had in mind the port of final destination and referred to the "landing" thereat.

It is not without significance that in another part of subsection 22, which treats of such goods condemned by the health authorities, Congress there speaks of the "port of *original* entry." The enforcement of that provision of the subsection at the port of original entry being one wherein the condition of the goods were such as they must be seized by the health officers, a matter of emergency, it is perfectly consistent with the views hereinbefore expressed. The enforcement of that section does not call for an interference with or examination of the goods by the importer or his agents.

We are unable to see why, if Congress intended the landing herein referred to to be the landing at the port of original entry, why it did not use the same language as it later did in the same section when speaking of certain action proceeding from and upon authority of the health officers. We are further constrained to this view of the case by the obvious fact that any other conclusion upon part of the court would result in a discrimination of one port against another in the enforcement of the tariff laws.

The cases of United States *v.* The Express (25 Fed. Cas., 1035; case 15066) and United States *v.* Smith (27 Fed. Cas., 1246; case 16343) are in harmony with the views herein expressed.

Reading the two acts together, we think the logical and fair inference is that the "landing" referred to in subsection 22, *supra*, is the landing at the port of destination, in this case Boston. Of course, the condition of the fruit at the time of arrival within the customs district of original arrival is the time of ascertainment and should be borne in mind in all such determinations. United States *v.* Shallus (2 Ct. Cust. Appls., 332; T. D. 32074).

For the reasons herein stated we are of the opinion that the decision of the Board of General Appraisers should be affirmed.